IN THE COMMONWEALTH COURT OF PENNSYLVANIA

H.R., a minor, C.R., a minor, K.R., :
a minor by their Parent and Guardian :
A.R. :
 :
   v. : No. 1008 C.D. 2020
 : Argued: October 21, 2021
 :
Shaler Area School District, :
     Appellant :


BEFORE: HONORABLE MARY HANNAH LEAVITT, Judge
    HONORABLE J. ANDREW CROMPTON, Judge[1]
    HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE LEAVITT[2]       FILED: January 5, 2022


   Shaler Area School District (School District) appeals an order of the Court of Common Pleas of Allegheny County (trial court) that set aside the School District's decision to terminate the enrollment of H.R., C.R., and K.R. (Children). The School District did so for the stated reason that Children's mother did not reside in the School District. Concluding that the School District's evidence did not substantiate its claim that A.R. (Mother) and Children do not reside in the School District, the trial court reversed the adjudication of the School District's Board of Directors. We affirm the trial court.

---

[1] The Court reached the decision in this case prior to the conclusion of Judge Crompton's service on the Commonwealth Court.

[2] This matter was assigned to the panel before January 3, 2022, when President Judge Emerita Leavitt became a senior judge on the Court.

**Background**

When Mother enrolled Children in the School District, she identified her address as 3411 Spring Garden Road, in Reserve Township, which is a home owned by her father (Grandfather) and located in the School District. During the 2019-2020 school year, K.R. was in eleventh grade at Shaler Area High School, C.R. was in seventh grade at Shaler Area Middle School, and H.R. was in kindergarten at Reserve Primary School. Children's father (Father) owns a home on the same street several blocks away, but it is located in the Pittsburgh Public School District. Mother and Father are separated.

In 2009, while K.R. was enrolled in elementary school, the School District challenged Mother's residency. On December 9, 2009, the School Board issued an adjudication that Mother and K.R. did not reside in the School District, but it allowed K.R. to finish the semester. In its adjudication, the School Board explained that Mother could change her family "living patterns" to make residency "in fact" within the School District. School Board Adjudication, 12/9/2009, at 8; Reproduced Record at 234a (R.R. __) (emphasis in original).

In response, Mother presented various documents to the School District, including a driver's license and an application for food stamp assistance, that listed her home address as 3411 Spring Garden Road. By letter of January 14, 2010, the School District informed Mother that she had demonstrated her residency in the School District and allowed K.R. to remain enrolled. The letter also advised Mother that "residency is primarily evidenced by physical domicile, not what address [she chose] to include on forms and applications." R.R. 245a. The letter warned that the School District intended to monitor Mother's residency.

At the start of the 2019-2020 school year, all three Children attended schools in the School District. In September of 2019, the School District initiated

2

an investigation into Mother's residency, which consisted principally of surveillance. By letter of January 8, 2020, the School District informed Mother that it concluded that she resided in the Pittsburgh School District and demanded the payment of tuition for the first semester of the 2019-2020 school year.[3] Mother requested a hearing.

At the February 10, 2020, hearing, the School District presented testimony about its surveillance of Mother. It also presented a written log of that surveillance, which was admitted into evidence.

Dr. Bryan O'Black, Assistant Superintendent, testified he is responsible for enrollment. In September of 2019, he directed two school district employees to investigate Mother's residency. In October, O'Black hired a private investigator to do additional surveillance.

The first employee, Kathy Newport, a social worker, testified that an unnamed individual, who claimed to have knowledge of the situation, informed Newport that Children did not reside in the School District. At approximately the same time, O'Black "received an anonymous letter" making the same claim. Notes of Testimony, 2/10/2020, at 56 (N.T. __); R.R. 33a.

Newport testified that on three different days in September, at different times of the day, she sat in her car near the school bus stop to wait for Children. On the afternoon of September 25, 2019, Newport saw Mother pick up K.R. and C.R. and take them to their Father's house in the Pittsburgh School District. On the morning of September 26, 2019, Newport saw Mother deliver C.R. and K.R. to the bus stop, at two different times, each time driving from the direction of Father's

---

[3] The letter included three invoices for each child's education from August 28, 2019, to January 10, 2020. The School District has since claimed that Mother owes the School District $39,966.36 in tuition for the 2019-2020 school year. Mother Brief at 5 n.1.

house.  On September 27, 2019, Newport saw Mother's minivan at Father's house. When Mother did not appear at the bus stop, Newport drove to the elementary school where she saw Mother drop off H.R.

Newport testified that also on September 27, 2019, she and Martin Martynuska, the principal of Reserve Primary School, visited 3411 Spring Garden Road.  Grandfather admitted the two into the house, explaining that Mother was not home.  He showed them the bedroom where Mother and Children slept.  Newport testified that

> [the] bedroom [] had just a bunkbed in it. . . .  The room was very neat.  There were no clothes.  There were no shoes.  It was literally just the beds, and they [] just kind of had sheets on them with a blanket.

N.T. 70; R.R. 37a.  Newport testified that she asked Grandfather if Children had slept there the previous nights and he replied "yes."  *Id*.  Newport and Martynuska then drove to the Father's house, where they found Mother's parked vehicle.

Martynuska testified that between September 27, 2019, and November 1, 2019, he surveilled both houses 27 times.  He confirmed Newport's account of their visit to Grandfather's house in Reserve Township.  He described the bedroom occupied by Mother and Children as approximately 11 feet by 11 feet, with two sets of bunkbeds and one dresser with nothing on it.  He did not observe Children's coats, shoes, sports equipment, toys or any pets.  After that visit, Martynuska returned to the school and listened to a voicemail from Mother, who stated that she had been at a dentist appointment when he and Newport visited Grandfather's house.  Mother further stated that Children did not have beds at Father's house.  Martynuska called Mother and advised her that they were following up on some information suggesting that she did not reside in the School District.

4

Martynuska testified that from October 3, 2019, to November 1, 2019, he saw Mother and Children at Father's house in Pittsburgh more often than at Grandfather's house in Reserve Township. Martynuska saw Mother's minivan parked in front of the Pittsburgh house 15 times over the course of 13 days, at different times of the day, but did not see Mother or Children. By contrast, he saw Mother's minivan parked at the Reserve Township house on four days at different times of the day. On two of those days, he saw Mother leave the Reserve Township house and take Children to the bus stop. Martynuska believed that Mother was taking steps to evade being seen at the Pittsburgh house. For example, on October 18, 2019, Mother drove to the Reserve Township house after taking Children to the bus stop and spent 30 minutes there before driving to the Pittsburgh house.

Jake DeChicchis, a private investigator hired by the School District, testified about his surveillance on December 17, 18 and 19, 2019, at times in the morning and late afternoon. On two days, he saw Mother leave the Pittsburgh house at different times between 5:30 a.m. and 8:10 a.m., get into the minivan with one of the Children, and drive toward the bus stop. He also watched the Pittsburgh house in the afternoons, arriving at approximately 1:30 p.m. On the afternoon of December 17, 2019, he went to the Reserve Township house but saw no signs of Children. Returning to the Pittsburgh house, DeChicchis saw Mother pull up in her minivan and drop off an unidentified male. On December 19, 2019, DiChicchis saw a white Ford truck arrive at the Pittsburgh house. A man resembling the individual he saw two days earlier got out of the truck and carried Christmas presents into the house. Thereafter, Mother and Children arrived at the house. DeChicchis reported no activity on December 18, 2019, when there was inclement weather.

5

The School District offered documentary evidence consisting of photographs of Children at the Pittsburgh house and Mother's social media posts, which also showed Children there.

Mother testified and presented documentary evidence. She offered photographs of Children with their, clothing, beds, bedding and toys at the Reserve Township house taken shortly before the School Board hearing. Mother also presented a variety of legal and financial documents identifying her home address as 3411 Spring Garden Road, Reserve Township. These documents included electric utility bills from 2015-2019 addressed to Mother; Mother's driver's license; K.R.'s learner's permit; Mother's certificate of title and registration for her minivan; a state assistance report for Mother and Children; medical reports and prescription labels; a bank statement; a tax form from Fidelity Investments for Mother; a Department of Human Services questionnaire on medical assistance; a January 6, 2020, letter from Reserve Primary School regarding H.R.; a yearbook notice for K.R.; a Sam's Club membership renewal; and a Pennsylvania Prescription Assistance letter.

Mother testified that she and Children reside in the School District. Mother acknowledged that she and Children spend time at the Pittsburgh house to visit Father, attend to the family pets, play on the trampoline or swim in the pool. She testified that they celebrate Christmas and Children's birthdays at the Pittsburgh house. Mother goes back and forth between the two residences. While Children sometimes sleep in the Pittsburgh house, they spend more time at Grandfather's house in Reserve Township.

### School Board Adjudication

The School Board concluded that Mother's "official residence" was in the Pittsburgh School District. School Board Adjudication, 4/8/2020, at 15; R.R.

18a. The School Board credited Mother's testimony that she and Children spend time at both houses, but rejected her testimony that she and Children spend more time at the Reserve Township house. The Board explained as follows:

> As was the case in the 2009 residency proceeding, the evidence presented at the 2020 residency hearing could be interpreted to some extent to support some "residency" at either the [Pittsburgh] home or the [Reserve Township] home. That is the nature of conflicting evidence and testimony in any case.
>
> When evaluating such conflict, the reliability and credibility of witnesses, and their possible motivations to construct or adjust testimony favorably must be considered. Here, [Mother] has reason to slant her testimony, while the witnesses presented by the [School] District have no stake in the outcome. . . .
>
> The evidence of record persuades the Board that while [Children] and [Mother] may stay at the [Reserve Township] home often, their presence in the [Pittsburgh] home is far more frequent than admitted. [Mother's] testimony about frequency is therefore rejected as unreliable. While there is obvious movement between the houses, for a variety of reasons, and people can often travel and "stay" other than "at home[,"] it remains that a person can have only one official residence. Based on the evidence presented in this case, the official residence of [Mother] and [Children] is at the [Pittsburgh] home.

School Board Adjudication, 4/8/2020, at 14-15; R.R. 17a-18a. The School Board agreed that Mother's documentary evidence showed that she resided in Reserve Township. However, it dismissed its significance, stating: "Ultimately, what establishes residency is the physical domicile of the individuals in question and not the address that such individuals may choose to have placed on any document or form." *Id*. at 15; R.R. 18a.

Thereafter, on May 6, 2020, the School District terminated the online links used by Children to attend their virtual classes in the School District.

7

## Trial Court

Mother appealed the School Board's adjudication and sought emergency relief to prevent the School District's termination of Children's online education, at least through the end of the 2019-2020 school year. The trial court granted this relief. The parties thereafter submitted briefs and presented oral argument to the trial court, which reversed the School Board's adjudication.

The trial court concluded that Mother's "ample documentary evidence" demonstrated her residency in the School District. Trial Court Op., 1/21/2021, at 11. That documentary evidence was all that was "necessary to enroll [Children] in the School District in the first instance." *Id.* The School District's surveillance evidence did not rebut Mother's evidence of residency or substantiate its claim that Mother did not reside in the School District.

First, the School District employees limited their site visit to the Reserve Township house. The trial court suggested that without a visit to the Pittsburgh house and an interview of Father, the visit to the Reserve Township house had limited evidentiary value.

Second, the School District presented neither "documentary evidence" nor "direct testimony" that Mother actually resided in the Pittsburgh house. Trial Court Op., 1/21/2021, at 13. The School District did 45 separate observations of both houses, but there were only 10 instances where Mother and Children were seen leaving the Pittsburgh house in the morning to go to the bus stop. There was only one instance where Children were seen at the end of the school day going from the bus stop to the Pittsburgh house. The trial court agreed with the School Board that the record evidence supported a finding of Mother's residency at both houses. However, the trial court rejected the School Board's factual finding that Mother

8

spent more time "residing" at the Pittsburgh house as not supported by substantial evidence.

The trial court also rejected the School Board's explanation for its credibility determination, *i.e.*, that Mother's testimony was slanted in her favor. The trial court noted that the School District's witnesses were all paid by the School District and as such, their testimony was likewise slanted in favor of the School District. The trial court concluded that the hearing examiner capriciously and deliberately disregarded Mother's testimonial and documentary evidence.

Based on the foregoing, the trial court concluded that the School District's "limited observations and surveillance demonstrated that Mother and [Children] spend *some* time at the Pittsburgh home," but this finding was insufficient to support the School District's conclusion that Mother and Children do not reside in the School District. *Id*. at 14 (emphasis in original).

The School District filed the instant appeal.[4]

**Appeal**

Before this Court, the School District raises two issues. It contends, first, that the trial court erred in rejecting the School Board's finding that Mother and Children did not reside in the School District as not supported by substantial

---

[4] Where a complete record is made before a school board and the trial court does not take additional evidence, the trial court's review of the school board's adjudication is limited to determining whether constitutional rights were violated, an error of law committed, or necessary findings of fact were supported by substantial evidence. *Whitacker-Reid v. Pottsgrove School District, Board of School Directors*, 160 A.3d 905, 912 n.13 (Pa. Cmwlth. 2017); *Bonatesta v. Northern Cambria School District*, 48 A.3d 552, 557 n.9 (Pa. Cmwlth. 2012). "Our scope of review of a trial court's decision is limited to determining whether the trial court abused its discretion, committed an error of law, or violated constitutional rights." *Behm v. Wilmington Area School District*, 996 A.2d 60, 64 n.6 (Pa. Cmwlth. 2010).

evidence. Second, it contends that the School Board did not deliberately disregard Mother's evidence in finding that she did not reside in the School District.

In support, the School District argues that its evidence established that Mother and Children resided in the Pittsburgh School District. Residency requires evidence of a person's actual "physical presence in a particular place." *In re Residence Hearing Before Board of School Directors, Cumberland Valley School District*, 744 A.2d 1272, 1275 (Pa. 2000) (*Cumberland Valley*) (quotation omitted). The School Board credited the School District's witness testimony that between the end of September to early November of 2019, Mother and Children spent more time at the Pittsburgh house. At the same time, the School Board did not credit Mother's testimony that she spends more time at the Reserve Township house. The School District argues that the trial court erred in rejecting its factual finding that Mother spent more time in the Pittsburgh house, which the trial court did by engaging in its "own inappropriate weighing of competing evidence of record." School District Brief at 18.

Mother counters that the School Board misconstrued the residency requirement in Section 1302(a) of the Public School Code of 1949 (Public School Code).[5] Only one parent must reside in the school district, and there is no requirement that this residence be the parent's "primary residence." *Cumberland Valley*, 744 A.2d at 1275. Mother notes that her testimony that Children do not have sleeping accommodations in the Pittsburgh house was unrebutted, and her documentary evidence, including utility bills, driver's licenses and bank account statements, were accepted when she enrolled Children in the School District. The School District's surveillance showed that children stayed overnight at Father's

---

[5] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §13-1302(a).

10

house 10 times over a 45-day period. This is not adequate to show that Mother spent more time at Father's Pittsburgh house than at the Reserve Township house. The School District offered no direct testimony from the informant, neighbors or even Father. Instead, it relied on anonymous tips and circumstantial evidence, from which it drew unreasonable inferences.

## Analysis

We begin with a review of the applicable law. Section 1302(a) of the Public School Code states that "[a] child shall be considered a resident of the school district in which *his parents* or the guardian of his person *resides*." 24 P.S. §13-1302(a) (emphasis added). To address the situation where parents are separated or divorced, the Department of Education has adopted a regulation that states, in relevant part:

> A school age child is entitled to attend the public schools of the child's district of residence. A child's district of residence is that in which the parents or the guardian resides. *When the parents reside in different school districts due to separation, divorce or other reason, the child may attend school in the district of residence of the parent with whom the child lives for a majority of the time*, unless a court order or court approved custody agreement specifies otherwise.

22 Pa. Code §11.11(a)(1) (emphasis added). Because a child cannot acquire a residence apart from his parents, the child's residency is that of the parent with whom he lives. *Mathias v. Richland School District*, 592 A.2d 811, 812 (Pa. Cmwlth. 1991) (quotation omitted). "Residence" has been defined by our Supreme Court as "a factual place of abode evidenced by a person's physical presence in a particular place," but it does not have to be the person's primary residence or place of domicile. *Cumberland Valley*, 744 A.2d at 1274. Section 1302(a) of the Public School Code

11

prevents "school shopping." *Paek v. Pen Argyl Area School District*, 923 A.2d 563, 567 (Pa. Cmwlth. 2007). In a Section 1302(a) case, the parent has the initial burden of proof, which may be satisfied by the presentation of evidence sufficient to satisfy the enrollment requirements for a child in the district. *Whitacker-Reid*, 160 A.3d at 917. Then, the burden shifts to the school district. *Id.* Specifically, the school district must substantiate its determination that the parent or guardian does not reside in the school district. *Id.*

*Cumberland Valley*, 744 A.2d 1272, is instructive on school district residency. In that case, the mother and her two children spent every weekend and holiday at the family's "primary" residence in Franklin County, where the Father lived and worked. The parents were not separated. In August of 2015, the mother leased a townhouse in Hampden Township and enrolled her younger child in the Cumberland Valley School District's special needs program. Her older child attended a private school. By October, it became apparent that the younger child needed placement in a residential educational institution, but Cumberland Valley refused to pay the tuition, arguing that the child actually resided in Franklin County. The school board held that the mother was not a resident of the school district because she intended to return to Franklin County after her sons graduated. This Court rejected this reasoning and reversed. On further appeal, the Supreme Court affirmed this Court.

The Supreme Court held that the school district's understanding of the term "resides" in Section 1302(a) of the Public School Code was too narrow and exacting. *Cumberland Valley*, 744 A.2d at 1275. It explained that a "domicile" is "the fixed, permanent, final home to which one always intends to return." *Id.* However, Section 1302(a) uses the term "resides," as opposed to "domiciled," and the choice of the legislature was purposeful. *Cumberland Valley*, 744 A.2d at 1275.

12

Section 1302(a) of the Public School Code does not require the residence in the school district to be the "primary residence." *Cumberland Valley*, 744 A.2d at 1275.

*Paek*, 923 A.2d 563, also concerned a parent with two residences. The mother owned a home in the school district, paid taxes to the school district, and had a driver's license listing her home address in the school district. She also owned another home two miles away, and the family moved between the two houses. However, the mother was careful to sleep two nights a week at the house in the school district. This Court concluded that the mother demonstrated only a "residence of convenience" in the school district. *Id.* at 567. In actuality, she "was keeping up the appearance of maintaining a home, not actually living there and having a physical presence" in the school district. *Id.*

*Whitacker-Reid*, 160 A.3d 905, considered evidence similar to that presented by the School District. In *Whitacker-Reid*, we explained that because the mother provided the documentary evidence of residency required by the Department of Education, the burden shifted to the school district to prove another residency. The school district did not meet that burden with surveillance evidence because the surveillance was not of sufficient duration on any one day, or in the aggregate, to establish the mother's physical presence. The school district employees watched the district address "'on a number of occasions' between May and September, [but] they did so *only* around the time the buses came to pick up and drop off students." *Id.* at 918 (citation and footnote omitted; emphasis in original). They were not watching the mother's address in the district "24 hours a day." *Id.* at 909. Accordingly, this surveillance evidence did not constitute "substantial evidence" that mother resided outside the school district; "it focused only on a limited time frame." *Id.* at 918.

This Court concluded that many of the school board's factual findings were not supported by substantial evidence or were insufficient to prove non-

residency. By contrast, the documentary evidence uniformly pointed to the mother's residency in the school district. The Court addressed *Behm*, 996 A.2d 60, and *Fort Cherry School District v. Pawlosky* (Pa. Cmwlth., No. 2811 C.D. 1999, filed July 21, 2000) (unreported), where the school district was able to prove a lack of residency. In both cases, the school district presented testimony from multiple witnesses, including neighbors, to prove that the family spent most of its time at the residence outside the school district.

In *Whitacker-Reid*, this Court concluded that the school board's findings merely "suggest[ed] or speculate[d]" that there "*could be*" a residency problem. *Whitacker-Reid*, 160 A.3d at 921 (emphasis in original). Given the consequences of a conclusion of non-residency, including criminal charges and the repayment of school tuition, this Court held the burden is on the school district to substantiate non-residency. To meet this burden, the school district must offer more than intermittent surveillance.

With these principles in mind, we turn to the School District's appeal.

In its first issue, the School District contends that the trial court erred in holding that substantial evidence did not support the School Board's finding that Mother resided outside the School District more than she resided inside the School District. It claims that the trial court improperly disregarded the School Board's decision to reject Mother's statement that she spent more time at Grandfather's house in Reserve Township than at Father's house in Pittsburgh.

As explained, Section 1302(a) of the Public School Code and the implementing regulation of the Department of Education provide that where, as here, parents are separated, "the child may attend school *in the district of residence of the parent with whom the child lives for a majority of the time*[.]" 22 Pa. Code §11.11(a) (emphasis added). Where parents have joint custody and time is evenly divided

14

between them, a child may have two residences. *Watts v. Manheim Township School District*, 121 A.3d 964, 975 (Pa. 2015). Parents also may have two residences, and residency may be established in a school district even if it is not the parent's "primary" residence. *Cumberland Valley*, 744 A.2d at 1275.

Here, Mother made a *prima facie* case of residency in the School District through documentary evidence showing the Reserve Township house as her address. This evidence included electric utility bills in Mother's name; Mother's voter registration; Mother's driver's license; and other pieces of mail. As noted by the trial court:

> While this Court agrees, at least to a certain extent, that documents might not always tell the whole story, it remains undisputed that Mother's documentary evidence was sufficient to originally enroll [Children] in the School District.

Trial Court Op., 1/21/2021, at 14. These documents satisfied Mother's limited burden. *Whitacker-Reid*, 160 A.3d at 917. The burden then shifted to the School District to prove that Mother is *not a resident* of the School District. *Id.*

The trial court held that, as in *Whitacker-Reid*, the School District's surveillance evidence did not support the School Board's finding that Mother spent more time at the Pittsburgh house. The trial court stated:

> School District's mere *ten observations of Mother and [Children] exiting the Pittsburgh [h]ome* in the early morning, a collection of Mother's social media posts, and generalized conclusions regarding the interior and exterior of both homes, do not necessarily lead to the conclusion that Mother and [Children] spend *more* time at the Pittsburgh [h]ome. *At best, the School District's observations and surveillance establish that Mother and [Children] spent some time at the Pittsburgh [h]ome.* This fact is not surprising, given that Father lives at the Pittsburgh

15

[h]ome only a few blocks away and has a vested interest in [Children's] lives.

Trial Court Op., 1/21/2021, at 13 (emphasis added). The trial court identified specific shortcomings in the School District's evidence:

> *School District's investigation of Mother and [Children] primarily focused primarily on a limited time frame.* In this case, during the course of a four-month long investigation consisting of at least forty-five (45) separate observations of both the Pittsburgh [h]ome and the [Reserve Township] [h]ome, the School District nonetheless *only* cites ten (10) specific instances where Mother and [Children] were seen leaving the Pittsburgh [h]ome in the morning to go to the School District bus stop before school. The School District further reported that Mother and [Children] were seen traveling back to the Pittsburgh [h]ome after school on *only* one (1) of those ten (10) instances.

*Id.* (emphasis in original and added). In short, the periodic sightings by School District employees did not support the School Board's factual finding that Mother and Children spent more time in the Pittsburgh house.

The School District takes issue with the trial court's summary of its surveillance evidence. It explains:

> [O]bservations of both the Pittsburgh [h]ome and the [Reserve Township] [h]ome on 22 dates at different times of the day, not all of which involved observations immediately prior to or following the school day and some which resulted in no observations of either Mother or [Children]. In comparison to the 10 instances noted by the [trial] court of leaving the Pittsburgh [h]ome in the morning to travel to school, *Mother and [Children] were observed leaving the [Reserve Township] [h]ome on only 6 of occasions, all within the two[-]week period after School District personnel visited the [Reserve Township] [h]ome to investigate residency.* Of the 3 days on which the School District observed Mother and [Children's] return from school, they were seen going to and entering the Pittsburgh

16

[h]ome on 2 of those days. (On the one day that the private investigator conducted an afternoon investigation, Mother [and Children] also went to the Pittsburgh [h]ome). On 3 other observations at the end of the school day, Mother's [minivan] was observed parked at the Pittsburgh [h]ome.

School District Brief at 24 (emphasis added).

The School District, however, fails to address the trial court's legal conclusion that its surveillance suffered from the same deficiencies identified in *Whitacker-Reid*. Specifically, the School District's surveillance consisted of intermittent sightings (or no sightings) of Mother and Children at different times of the day; did not cover a 24-hour period; and covered only a 6-week period of time. The School District's staff observed Mother and Children on 22 days, at times just before and just after the school day. This is inadequate to rebut Mother's *prima facie* case.

Further, the School District did not produce any other evidence, such as testimony by the informant who allegedly knew that Mother and Children do not reside in the School District, or from neighbors or even Father. *Cf. Behm,* 996 A.2d 60. The School District personnel did not visit the Pittsburgh house, which Mother explained is a "one-bedroom house" where Children "occasionally" sleep on a rollout couch. N.T. at 116; R.R. 48a.[6]

Mother acknowledged that she and Children spend time at the Pittsburgh house for various reasons. Children's birthday parties are held at Father's house because he has a swimming pool, trampoline, and swing set. Children's pet

---

[6] Allegheny County assessment records confirm that Father's house is a one-bedroom home with one bath and that the Reserve Township house is a three-bedroom home with two baths, which is sufficient to accommodate a family. N.T. 20, School District Exs. 5 & 6; R.R. at 24a, 79a, 81a.

17

dogs live there, and Father decorates the house with lights for Christmas for Children. These facts did not establish residency outside the School District.

It was the School District's burden to substantiate where Mother and Children spend the majority of their time. *Cumberland Valley*, 744 A.2d at 1274. The School Board acknowledged that the evidence presented by the School District could be interpreted "*to support some 'residency' at either the [Pittsburgh h]ome or the [Reserve Township h]ome*." School Adjudication, at 14 (emphasis added). The School District's surveillance evidence was inadequate for all the reasons set forth in *Whitacker-Reid*, 160 A.3d at 918 (surveillance in the afternoon, not "24 hours," and not over an extended period of time did not constitute substantial evidence to establish residency). Accordingly, the School District's finding that Mother spent more time at the Pittsburgh house was not supported by substantial evidence, and the trial court did not err in so holding.[7]

### Conclusion

For these reasons, we affirm the order of the trial court.

_____
MARY HANNAH LEAVITT, President Judge Emerita

---

[7] Because of our decision on the School District's first issue, we need not consider whether the trial court was correct in concluding that the School Board capriciously disregarded Mother's evidence.

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

H.R., a minor, C.R., a minor, K.R.,     :
a minor by their Parent and Guardian  :
A.R.                                  :
                                         :
           v.                        :    No. 1008 C.D. 2020
                                         :
                                         :
Shaler Area School District,        :
                      Appellant    :

## **ORDER**

AND NOW, this 5th day of January, 2022, the September 15, 2020, order of the Court of Common Pleas of Allegheny County is AFFIRMED.

_____
MARY HANNAH LEAVITT, President Judge Emerita